JV:AB
F. #2017R01691

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
IARONOV1@GMAIL.COM THAT IS
STORED AT PREMISES CONTROLLED
BY GOOGLE LLC

**TO BE FILED UNDER SEAL**

**APPLICATION FOR A
SEARCH WARRANT FOR
INFORMATION IN
POSSESSION OF A PROVIDER
(EMAIL ACCOUNT)**

Case No. 20-MJ-163

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Jaclyn Nunez, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain email account, specifically "IARONOV1@gmail.com" (the "SUBJECT EMAIL ACCOUNT"), that is stored at premises controlled by Google LLC ("Google"), an email provider headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2.      I am a Special Agent with the Federal Housing Finance Agency – Office of the Inspector General ("FHFA-OIG") and have been so since January 2016.  Since October 2017, I have been assigned to the El Dorado Task Force which consists of members from a number of law enforcement agencies, including the United States Department of Homeland Security, Homeland Security Investigations ("HSI"), and investigates financial crimes.   As a Special Agent, I am responsible for investigating violations of, among other crimes, Title 18, United States Code, Sections 371 (conspiracy against the United States), 1343 (wire fraud), 1344 (bank fraud), 1349 (wire and bank fraud conspiracy), 1956 and 1957 (money laundering).   During the course of these investigations, I have conducted or participated in surveillance and the execution of search warrants, used information gathered from tracking devices and reviewed electronic evidence.   My experience also has included the investigation of the use of computers, cell phones and the internet to commit fraud.  I have received training and have gained experience in interviewing and interrogation techniques, arrest procedures, search warrant applications, the execution of searches and seizures, computer crimes, computer evidence seizure and processing, and various other criminal law and procedures.

3.      This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.  The information contained in this affidavit includes information that I obtained from my personal participation in the investigation, reports made to me by other law enforcement agents and officers, information obtained from confidential sources of information, interviews with witnesses and from law enforcement and public records databases.  The statements described in this affidavit are set forth in sum, substance, and in part.

4.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Sections 371, 1343, 1344, and 1349, and Title 18, United States Code, Sections 1956 and 1957, have been committed by Tomer Dafna, Iskyo Aronov, Michael Konstantinovskiy, Avraham Tarshish, Michael Herskowitz and others, known and unknown.  There is also probable cause to search the information described in Attachment A for evidence, fruits and instrumentalities of these crimes, further described in Attachment B.

## **JURISDICTION**

5.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## **BACKGROUND**

6.     The Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") are government-sponsored enterprises chartered by Congress.  Fannie Mae and Freddie Mac purchase residential mortgage loans in the U.S. secondary market.  The Federal Housing Finance Agency ("FHFA") is a federal agency created on July 30, 2008 to oversee Fannie Mae, Freddie Mac, and the Federal Home Loan Banks.  Fannie Mae and Freddie Mac are in conservatorships overseen by FHFA as conservator.

7.     The United States Department of Housing and Urban Development ("HUD") is a department of the Executive branch of the federal government.  The Federal Housing Administration ("FHA") is an agency of HUD.  FHA provides mortgage insurance to

3

FHA-approved lenders who provided mortgages to borrowers that met certain eligibility requirements.

8.      A pre-foreclosure sale, otherwise known as a "short sale," allows a borrower who is in default on a mortgage loan to give up his or her property without a foreclosure.  In a short sale, with the approval of the holder of a mortgage loan, referred to as "lender" herein, or the mortgage loan servicer, a borrower is permitted to sell his or her home for less than the outstanding balance of the mortgage.  The proceeds from the short sale, minus approved closing costs, are applied to the outstanding mortgage balance owed to the lender, who typically agrees to forgive the borrower's remaining mortgage balance.

9.      HUD, Fannie Mae and Freddie Mac permit short sales of properties that secured loans they insure, guarantee or own if the short sale met certain requirements.  Lenders and servicers typically require the parties to a proposed short sale to submit documents and information to show that the short sale meets the applicable requirements, or their own internal requirements for approving a short sale.  Among other things, parties to a short sale typically are required to certify to the lender or servicer in an affidavit, sometimes referred to as a Short Sale Affidavit or an Arm's Length Transaction Affidavit, that the sale is an arm's length transaction and that: (1) there are no hidden terms or special understandings between any of the parties involved in the transaction; (2) any relationship or affiliation among the parties involved in the transaction has been disclosed to the lender or servicer; (3) neither the buyer nor the seller will receive any funds or commissions from the sale unless approved by the servicer or lender; (4) there are no current or pending higher offers, or contracts relating to the current sale or subsequent sale of the property that have not been disclosed to the lender or servicer; (5) all amounts paid to any person or entity in connection to the sale are approved and reflected on the

4

HUD-1 Settlement Statement; and (6) that the property has been listed for sale for a certain amount of time before any offers were evaluated and the presented offer yields the highest net return to the lender.

## PROBABLE CAUSE

10.     As described below, there is probable cause to believe that violations of Title 18, United States Code, Sections 371 (conspiracy against the United States), 1343 (wire fraud), 1344 (bank fraud), 1349 (wire and bank fraud conspiracy), 1956 and 1957 (money laundering), have been committed, and are being committed, by Iskyo Aronov and others known and unknown.  There is also probable cause to search the SUBJECT EMAIL ACCOUNT described in Attachment A for evidence, instrumentalities, contraband and fruits of these crimes, further described in Attachment B.

A.     **The Short Sale Fraud Scheme**

11.     By way of background, the United States has been conducting a criminal investigation since 2017, into a short sale fraud scheme involving Iskyo Aronov, also known as "Isaac Aronov," Tomer Dafna, Michael Konstantinovskiy, also known as "Michael Kay," Avraham Tarshish, also known as "Avi Tarshish," and Michael Herskowitz, among others, who conspired to defraud lenders, including lenders who held FHA-insured loans, Fannie Mae and Freddie Mac, and certain borrowers (collectively, the "Short Sale Victims") by providing them with false, misleading and incomplete information to induce them to execute short sales of residential properties at fraudulently depressed prices, thereby causing losses to the lenders and, at times, the borrowers (the "Short Sale Scheme").   Aronov, Dafna, Konstantinovskiy, Tarshish and Herskowitz, and a number of other individuals, worked both together and separately to

5

purchase hundreds of properties at fraudulently depressed prices and then resell or "flip" the properties for large profits.

12.     The Short Sale Scheme originated at a company Aronov controlled known as My Ideal Property Inc. ("MIP") located in Queens, New York, in late 2012, under the direction of Aronov.  Aronov worked closely with Konstantinovskiy, who controlled National Homeowners Assistance Inc. ("NHA"), an entity that negotiated short sale approvals with servicers while purporting to represent the home owner.  Tarshish initially worked under Aronov in 2013.

13.     In the Short Sale Scheme, the Short Sale Co-Conspirators primarily targeted borrowers who owned homes in Brooklyn and Queens, New York, who were in default on their mortgages and in foreclosure proceedings.  The Short Sale Co-Conspirators contacted borrowers who owned such properties and attempted to persuade the borrowers to sell their homes to the Short Sale Co-Conspirators in short sale transactions.  If a borrower agreed, the Short Sale Co-Conspirators typically paid the borrower money to induce him or her also to sign: (1) an agreement with a real estate broker to list the property for sale, (2) an authorization to allow a third-party negotiator to negotiate the short sale with the lender on the borrower's behalf and (3) a contract to sell the property to a corporate entity created for the purpose of acquiring the property and that was controlled by the Short Sale Co-Conspirators.  These documents were typically sent to the lender or servicer.  If a borrower contacted by the Short Sale Co-Conspirators agreed to participate in a short sale transaction, the Short Sale Co-Conspirators worked on obtaining access to and control over the property and monitored the progress of the short sale approval process.

6

14.     Once a borrower agreed to sell his or her property in a short sale coordinated by the Short Sale Co-Conspirators, they did not market the property to other prospective buyers, regardless of any requirement to do so by the lender or servicer. Instead, they worked together to ensure that the Short Sale Co-Conspirators purchased the property for the lowest price that the lender or servicer would accept. The Short Sale Co-Conspirators typically instructed the broker who had listed the property for sale to tell any potential purchaser who inquired about the property that the property was already "under contract" or otherwise not available for a showing. The third-party negotiator, identified to the lender or servicer as the borrower's agent and sometimes the same party who purportedly acted as the listing broker for the property, typically worked for the Short Sale Co-Conspirators and often was paid fees by the Short Sale Co-Conspirators in addition to and above any commission or fee disclosed to the lender or servicer. If a short sale offer was rejected by the lender or servicer, another corporate entity created by the Short Sale Co-Conspirators would submit another short sale offer after waiting for a period of time. The longer a property appeared to have been on the market, the greater the likelihood was that the lender or servicer would accept a proposed short sale price below any objective appraisal of the property's value.

15.     On occasion, the Short Sale Co-Conspirators paid a borrower money to transfer the deed of ownership of his or her property to a Short Sale Co-Conspirator before the Short Sale Co-Conspirators negotiated a short sale on behalf of the borrower with the lender or servicer. The deed transfer provided funds to the borrower, prevented the borrower from selling the property to another purchaser and gave the Short Sale Co-Conspirators control of the property even if the short sale was not approved. In instances involving such a deed transfer, certain borrowers were told only that they were agreeing to a short sale and did not understand

7

that they were, in fact, transferring their ownership rights to their property.  Subsequently, prior to the closing of any approved short sale, the Short Sale Co-Conspirators transferred the deed back to the borrower for no consideration so that title of the property could be conveyed from the borrower to the short sale purchaser at the short sale closing in conformity with the terms of the sales contract signed by the borrower and provided to the lender or servicer as part of the short sale approval process.

16.     The Short Sale Co-Conspirators also often filed fraudulent UCC-1 Financing Statements on properties the Short Sale Co-Conspirators intended to purchase so as to deter, or to obtain money from, other prospective buyers, who would need the filed UCC-1 Financing Statements terminated to clear the title of the property.

17.     When the Short Sale Co-Conspirators submitted documentation to obtain approval for a short sale, they provided false, misleading and incomplete information to the lender or servicer.  Among other things, in the required short sale affidavit and transaction documents, the Short Sale Co-Conspirators did not disclose that payments had been made to the borrower, that the property was not marketed as required and that the agents for the borrower and purchaser were affiliated by commercial enterprise.  Furthermore, the Short Sale Co-Conspirators did not disclose all the past and future payments, including fees and commissions, to be paid to the Short Sale Co-Conspirators or the borrower in connection with the short sale.

18.     In or about January 2014, Dafna and Tarshish replicated the Short Sale Scheme at companies they created known as Exclusive Homes Realty Group Inc., Exclusive Homes NY, LLC (together, "Exclusive Homes") and Homeowners Solutions Group LTD ("Homeowners Solutions") all located in Brooklyn, New York.  Herskowitz was a real estate attorney who assisted Aronov and Dafna in completing certain fraudulent short sale transactions.

8

**B.**   **Aronov's Role**

19.   Aronov formed MIP on or about December 5, 2012, and was the company's President. MIP marketed itself as a real estate development company that was focused on rehabilitating distressed properties. MIP claimed that it built, maintained and marketed properties, and that it had developed a list of professionals with which it worked with, including mortgage bankers, inspectors, engineers, attorneys, insurance representatives, short sale processors and other professionals who were involved in the process of buying and selling property.

20.   In addition to MIP, Aronov also owned and controlled a number of other corporate entities formed to buy and sell real property, including MIP Management Inc., LL Organization Inc., LL Fund Inc., IA Investors LLC, AG2 Equities, Inc., PIM Equities Inc. and IJ Development LLC. Multiple individuals who were interviewed by agents have identified Aronov as conducting the Short Sale Scheme through these corporate entities, his subordinates and agents.

21.   Through MIP and other corporate entities, Aronov purchased and sold properties involved in the Short Sale Scheme. Acting through these entities, his subordinates and agents, Aronov would arrange for the purchase of properties in short sales, negotiating the purchase price, communicating with the banks that held the mortgages on the properties prior to purchase and arranging for undisclosed side payments to the property-owners. In short, Aronov would control and direct transactions under investigation.

22.   A Short Sale Co-Conspirator ("Short Sale Co-Conspirator 1"),

9

████████████████████████████████ ▐ ████████████████████ worked

for Aronov and Tarshish at MIP, and then worked with Dafna and Tarshish at Exclusive Homes.

████████████████████████████████████████████████████████████

████████████████████████████████ Among other things, Short Sale Co-

Conspirator 1 directly approached homeowners and persuaded them to sell their properties in

short sales coordinated by MIP or Exclusive Homes. Short Sale Co-Conspirator 1 also filed

hundreds of fraudulent UCC-1 Financing Statements on properties that Exclusive Homes wanted

to purchase to try to ensure that Exclusive Homes and Short Sale Co-Conspirator 1 would get

paid money if another party ended up purchasing the property.

████████████████████████████████████████████████████████████

     24.    Agents have identified a number of fraudulent short sale transactions that

involved Aronov, including the short sales of the properties at 1219 Jefferson Avenue, Brooklyn,

████████████████████████████████████████████████████████████

New York ("1219 Jefferson") and 1319 Jefferson Avenue, Brooklyn, New York ("1319 Jefferson").

25.     In both of these transactions, after the servicer approved the short sale to a specific corporate entity controlled by Aronov and his co-conspirators at a specific price but before the transaction closed, Aronov and others secretly arranged to sell the property for amounts above the short sale price by transferring the corporate entity to a subsequent purchaser at or about the time of the closing.  Both of these transactions involved fraudulent representations by the Short Sale Co-Conspirators to the servicer who approved the sale.  These included false statements about the true nature of the transaction, the actual purchase price paid, and the payments made to the various parties involved in the transactions.

**1219 Jefferson Avenue**

26.     Aronov, together with others, coordinated a short sale transaction to purchase a residence located at 1219 Jefferson Avenue, Brooklyn, New York ("1219 Jefferson Avenue"), for a price of $275,000 on or about July 22, 2014, as follows:

a.     In or about July 2013, Short Sale Co-Conspirator 1 initiated contact with the borrower who had defaulted on the mortgage loan for the property (the "1219 Jefferson Avenue Seller"), and persuaded her to sell 1219 Jefferson Avenue in a short sale coordinated by Aronov at MIP and Konstantinovskiy at NHA. Financial Institution 1, an entity the identity of which is known to the Grand Jury, held the mortgage loan for 1219 Jefferson Avenue.  On or about July 2, 2013 and October 21, 2013, the 1219 Jefferson Avenue Seller signed a contract to sell 1219 Jefferson Avenue to an entity called 1219 Jefferson Ave. Inc., which was controlled by Aronov.

11

b.  On or about August 28, 2013, Aronov emailed his co-conspirators from the
SUBJECT EMAIL ACCOUNT asking, "Hi guys, How r we looking on the file
below?"   Konstantinovskiy replied to Aronov at the SUBJECT EMAIL
ACCOUNT stating that they were "[w]aiting for the file to be released." On or
about August 29, 2013, Aronov forwarded the status update to Tarshish and Short
Sale Co-Conspirator 1 from the SUBJECT EMAIL ACCOUNT, copying
Konstantinovskiy and others.

c.  On or about August 29, 2013, Short Sale Co-Conspirator 1 emailed Aronov at the
SUBJECT EMAIL ACCOUNT to provide information about the homeowner's
prior real estate agent and the status of eviction proceedings. Short Sale Co-
Conspirator 1 asked Aronov to "see what info you can get from her and see if we
can compensate her for her time on the file." That same day, Aronov responded
from the SUBJECT EMAIL ACCOUNT, asking Short Sale Co-Conspirator 1 to
call the homeowner's prior agent instead of himself.

d.  In or about and between October 31, 2013, and November 6, 2013, Aronov –
using the SUBJECT EMAIL ACCOUNT, ▊▊▊▊▊▊▊▊▊▊▊▊

▊▊▊▊▊ and others emailed each other about scheduling a broker priced
opinion ("BPO") visit to 1219 Jefferson Avenue to obtain an estimated price for
the property. On or about November 6, 2013, Konstantinovskiy emails Aronov at
the SUBJECT EMAIL ACCOUNT, ▊▊▊▊▊▊▊▊▊▊ and others
stating, "I don't think it's a good idea to complete this bpo with all the people In
[*sic*] the property. This is a Fannie Mae file and they will set a value far higher
than what we need if the property is livable."

12

e. In or about 2014, the 1219 Jefferson Avenue Seller also began working with representatives of Exclusive Homes, while Konstantinovskiy and others at NHA continued to work on getting the short sale to 1219 Jefferson Ave. Inc. approved by the servicer. As a condition of the short sale approval, the servicer required the parties to the transaction to sign a Short Payoff Arms-Length Affidavit, which stated, among other things, that "there are no agreements, understandings, or contracts relating to the current or subsequent sale of [the property] that have not been disclosed to the Servicer," and that "all amounts to be paid to any party . . . in connection with the short payoff transaction have been disclosed to and approved by the Servicer and will be reflected on the HUD-1 Settlement Statement."

f. Prior to the short sale closing but after it had been approved by the servicer, in or about July 2014, Aronov, Dafna and Tarshish agreed to sell 1219 Jefferson Avenue for approximately $625,000 to a purchaser ("Subsequent Purchaser 1") located by Aronov. As part of this transaction, ownership of 1219 Jefferson Ave. Inc., the entity Aronov controlled that had entered into the contract to purchase the property, was transferred to Subsequent Purchaser 1 on or about July 23, 2014.

g. On or about July 21, 2014,          emailed Aronov at the SUBJECT EMAIL ACCOUNT,                                             and others, asking "Isaac, we closing this tomorrow? You purchasing?" Aronov replied from the SUBJECT EMAIL ACCOUNT, "Yes I might be purchasing[.] Let's just set

13

everything up and make sure the other side is ready to go with [lis pendens]
release."

h. Later on or about July 21, 2014,                                     emailed Aronov at
the SUBJECT EMAIL ACCOUNT,                          and others stating "Isaac –
I have buyer for $640 and $625 – please let me know if you closing on this or if I
should send attorney info to Michael for my buyer." Aronov replied from the
SUBJECT EMAIL ACCOUNT, "Send me attorney info for both."

i. On or about July 23, 2014, the short sale closed at a purchase price of $275,000,
and the 1219 Jefferson Avenue Seller transferred the property to 1219 Jefferson
Ave. Inc. Also on or about July 23, 2014, Herskowitz wired approximately
$252,755 to the servicer's bank account to satisfy the short sale payoff amount
due.

j. On or about August 28, 2014, Aronov emailed Tarshish a spreadsheet entitled
"1219 Jefferson Avenue, Brooklyn Recap 8-26-14." The spreadsheet reflected
the property's "sales price" of $625,000, and deducted both the "purchase price"
of $275,000 and various expenses that had not been reflected on the HUD-1
Settlement Statement, for a total "net profit" from the transaction of $158,772.01.
The spreadsheet further noted that of the "net profit," $79,386 was due to Aronov

k. On or about November 4, 2013, Aronov – using the SUBJECT EMAIL
ACCOUNT,                                          and others emailed about a

14

$5,000 payment to 1219 Jefferson Avenue's seller, with Aronov directing

Tarshish to "[p]lease handle."

**1319 Jefferson Avenue**

27.    Aronov, together with others, coordinated a short sale transaction to purchase a

residence located at 1319 Jefferson Avenue, Brooklyn, New York ("1319 Jefferson Avenue"),

for a price of $550,000 on or about September 17, 2014, as follows:

a. Fannie Mae held the mortgage loan for 1319 Jefferson Avenue.

b. In or about April 2013, Short Sale Co-Conspirator 1 initiated contact with the

borrower who had defaulted on the mortgage loan for the property (the "1319

Jefferson Avenue Seller"), and persuaded him to sell 1319 Jefferson Avenue in a

short sale coordinated by Aronov at MIP and Konstantinovskiy at NHA.

c. 

d. In or about 2014, the 1319 Jefferson Avenue Seller also began working with

representatives of Exclusive Homes.  On or about April 28, 2014, Tarshish

incorporated 1319 Holdings LLC, which was created to purchase 1319 Jefferson

Avenue.

e. To establish control over the property, on or about July 15, 2014, Tarshish wrote

the 1319 Jefferson Avenue Seller a $20,000 check from Eliya Properties LLC, an

15

entity controlled by Tarshish. In return for the $20,000, the 1319 Jefferson
Avenue Seller provided the deed to 1319 Jefferson Avenue to Eliya Properties
LLC.

f. 

g. In or about August 2014, Aronov and Konstantinovskiy convinced the servicer to
approve a short sale of 1319 Jefferson Avenue to 1319 Holdings LLC for a price
of $550,000. The approval was contingent on a number of conditions, including
the receipt of a final HUD-1 Settlement Statement approved by the servicer and
the receipt of a Short Sale Affidavit.

h. Prior to the short sale closing but after it had been approved by the servicer, in or
about September 2014, Dafna, Tarshish and Aronov agreed to sell the property to
a purchaser ("Subsequent Purchaser 2") located by Aronov for approximately
$720,000.

i.

16



j.

k.

l. Eliya Properties LLC transferred the deed back to the 1319 Jefferson Avenue
Seller immediately prior to the short sale closing so that title of the property could
transfer directly from the 1319 Jefferson Avenue Seller to 1319 Holdings LLC,
the corporate entity approved to purchase the property. On or about September
17, 2014, the short sale closed.

m. After the short sale closed, the final HUD-1 Settlement Statement and Short Sale
Affidavit, both dated September 17, 2014, were transmitted to the servicer. The
Short Sale Affidavit was signed by the 1319 Jefferson Avenue Seller,
Konstantinovskiy and Subsequent Purchaser 2, and it contained material
misrepresentations, including that there were no "agreements, understandings, or

17

contracts relating to the current or subsequent sale of the property that have not been disclosed to the Servicer," and that "all amounts to be paid to any person or entity . . . in connection with the short sale have been disclosed to and approved by the Servicer and will be reflected on the HUD-1 Settlement Statement." In reality, neither the actual purchase price paid by Subsequent Purchaser 2 nor the past and future payments to the 1319 Jefferson Avenue Seller and the Short Sale Co-Conspirators, including Aronov, Konstantinovskiy, Tarshish and Dafna, had been disclosed to the servicer.

n. Fannie Mae calculated its loss on the mortgage loan for 1319 Jefferson Avenue to be approximately $290,268.

28. During the course of the investigation, I reviewed bank records of accounts controlled by numerous individuals, including Aronov. I determined that Aronov often moves money between accounts controlled by himself and others, including accounts in the names of business entities controlled by Aronov, which appears to be an effort to disguise the source or ownership of the funds.

**Prior Applications**

29. On August 23, 2019, the Honorable Steven M. Gold, United States Magistrate Judge for the Eastern District of New York, issued a Search and Seizure Warrant for forensic images of two iPhones and an iPad which were in Dafna's possession during the course of a border inspection (19-MJ-765) (Under Seal). The returns from that Search and Seizure Warrant were not included or used, in whole or in part, as a basis for this Application.

30. On September 9, 2019, the Honorable Lois Bloom, United States Magistrate Judge for the Eastern District of New York issued a search warrant for Dafna's home,

18

for the Premises Known and Described as 9 Stream Court, Great Neck, New York, 11023 (19-MJ-806) (Under Seal).  The returns from that Search and Seizure Warrant were not included or used, in whole or in part, as a basis for this Application.

      31.    On August 14, 2019, the government served a preservation request pursuant to 18 U.S.C. § 2703(f) upon Google and renewed that request pursuant to 18 U.S.C. § 2703(f)(2) on November 14, 2019.  Both requests asked Google to preserve all stored communications, records and other evidence regarding the SUBJECT EMAIL ACCOUNT for a period of 90 days.

    **C.**    **Indictment**

      32.    On September 6, 2019, a Grand Jury returned an indictment against Tomer Dafna, Iskyo Aronov, Michael Konstantinovskiy, Avraham Tarshish and Michael Herskowitz.  See United States v. Aronov, et al., 19-CR-408 (MKB).  The United States' investigation into the conduct underlying the allegations in the indictment and into additional charges against the defendants and others, known and unknown, is ongoing.

### BACKGROUND CONCERNING EMAIL

      33.    In my training and experience, I have learned that Google provides a variety of on-line services, including electronic mail ("email") access, to the public.  Google allows subscribers to obtain email accounts at the domain name aol.com, like the email account listed in Attachment A.  Subscribers obtain an account by registering with Google.  During the registration process, Google asks subscribers to provide basic personal information.  Therefore, the computers of Google are likely to contain stored electronic communications (including retrieved and unretrieved email for Google subscribers) and information concerning subscribers and their use of Google services, such as account access information, email transaction

information and account application information.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

34.     In general, an email that is sent to a Google subscriber is stored in the subscriber's "mail box" on Google's servers until the subscriber deletes the email.  If the subscriber does not delete the message, the message can remain on Google's servers indefinitely.  Even if the subscriber deletes the email, it may continue to be available on Google's servers for a certain period of time.

35.     An Google subscriber can also store with the provider files in addition to emails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to emails), and other files, on servers maintained and/or owned by Google.  In my training and experience, evidence of who was using an email account may be found in address books, contact or buddy lists, email in the account, and attachments to emails, including pictures and files.

36.     In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account.  Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses and, for paying subscribers, means and source of payment (including any credit or bank account number).  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.  Based on my training and my experience, I know that, even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

20

37.     In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems.  This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account.  In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

38.     In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

39.     As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and

21

experience, the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the email provider can show how and when the account was accessed or used. For example, as described below, email providers typically log the IP addresses from which users access the email account, along with the time and date of that access. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (e.g., location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

## CONCLUSION

40.     Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Google, who will then compile the requested records at a

time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## REQUEST FOR SEALING AND NON-DISCLOSURE

41.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation.  The scope of the ongoing criminal investigation is not public nor known to all of the targets of the investigation.  Specifically, even though certain participants in the Short Sale Scheme have been arrested, the government is investigating and may seek to indict additional participants, who should they learn of the scope of our investigation, may attempt to flee from prosecution, destroy or tamper with evidence, change patterns of behavior, intimidate potential witnesses, notify confederates or otherwise seriously jeopardize the investigation.  Moreover, some of the evidence in this investigation involves communications that can be transferred to alternate platforms (including encrypted platforms and platforms beyond the jurisdictional reach of U.S. legal process).  If alerted to the existence of the warrant and the broader scope of the ongoing investigation, there is reason to believe that the subjects under investigation may seek to destroy that evidence and change their patterns of behavior.  Accordingly, there is good cause to seal all papers in support of this application.

42.     Pursuant to 18 U.S.C. § 2705(b) and for the reasons stated above, it is further requested that the Court issue an Order commanding Google not to notify any person (including subscribers or customers of the account listed in the attached warrant) of the existence of the

attached warrant for the period of one year from the date of the Order, except that Google may

disclose the warrant to its respective attorney for the purpose of receiving legal advice.

Respectfully submitted,

Jaclyn Nunez
Special Agent
FHFA-OIG

Subscribed and sworn to before me on February 14, 2020

HONORABLE LOIS BLOOM
UNITED STATES MAGISTRATE JUDGE

24

## **ATTACHMENT A**

### **Property to Be Searched**

This warrant applies to information associated with "IARONOV1@gmail.com" that is stored at premises owned, maintained, controlled or operated by Google LLC, a company headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043.

## ATTACHMENT B

### Particular Things to be Seized

**I.      Information to be Disclosed by Google LLC (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody or control of the Provider, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on August 14, 2019, and renewed pursuant to 18 U.S.C. § 2703(f)(2) on November 14, 2019, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.      The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent and the size and length of each email;

b.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.      The types of service utilized;

d.      All records or other information stored by an individual using the account, including address books, contact and buddy lists, calendar data, pictures and files; and

e.      All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken. The Provider is hereby ordered to disclose the above information to the government within 14 days of service of this warrant.

**II.      Information to be Seized by the Government**

All information described above in Section I that evidence, fruits and instrumentalities of wire fraud, bank fraud, and conspiracy to commit wire fraud and bank fraud, in violation of Title 18, United States Code, Sections 371, 1343, 1344, and 1349, and money laundering, in violation of Title 18, United States Code, Sections 1956 and 1957, involving Iskyo Aronov, also known as "Isaac Aronov," and occurring after January 1, 2014, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

(a) All records and information described in Attachment A, including names and telephone numbers, as well as the contents of all call logs, contact lists, text messages, emails (including those sent, received, deleted and drafted), instant messages, photographs, videos, Facebook posts, Internet activity (including browser history, web page logs, and search terms entered by the user), and other electronic media constituting evidence, fruits or instrumentalities of a conspiracy to wire fraud, bank fraud, and conspiracy to commit wire fraud and bank fraud, in violation of Title 18, United States Code, Sections 371, 1343, 1344, and 1349, and money laundering, in violation of Title 18, United States Code, Sections 1956 and 1957;

(b) any information related to real estate transactions involving fraudulent short sales or misrepresentations to mortgage loan lenders or servicers;

2

(c) any information related to the disposition of proceeds obtained from fraudulent short sales transactions;

(d) any communications among the participants in the scheme to engage in fraudulent short sale transactions;

(e) all bank records, checks, credit card bills, account information, and other financial records;

(f) Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

(g) Evidence indicating the email account owner's state of mind as it relates to the crime under investigation; and

(h) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

(i) Records relating to the identity of, and email accounts used by, persons and business that communicated with the email account owner concerning real estate transactions involving fraudulent short sales or misrepresentations to mortgage loan lenders or servicers, including records that help reveal their whereabouts.